# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

| | |
|---|---|
| United States of America, | Crim. No. 19-306 (ADM/BRT) |
| Plaintiff, | |
| v. | |
| | **REPORT AND** |
| Derwin Idell Moore (1), | **RECOMMENDATION** |
| Kevin Kareem White (2), | |
| Defendants. | |

---

Thomas Calhoun-Lopez, Esq., Assistant United States Attorney, counsel for Plaintiff.

Andrew S. Garvis, Esq., Koch & Garvis, counsel for Defendant Derwin Idell Moore.

Shannon Elkins, Esq., Federal Public Defender, counsel for Defendant Kevin Kareem White.

---

BECKY R. THORSON, United States Magistrate Judge.

This matter is before the Court on Defendant Kevin Kareem White's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 35), and Defendant Derwin Idell Moore's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 44) and Motion to Suppress Evidence Obtained as a Result of a Search and Seizure (Doc. No. 45). The Government opposes these motions. (Doc. Nos. 36, 52.) The Court held a hearing on February 10, 2020, at which testimony was heard from Government witnesses and exhibits were received. (Doc. Nos. 54, 55, 61.) The Court received post-hearing briefing from the Defendants (Doc. Nos. 65, 66) and the Government (Doc. No. 67). For the reasons that follow, this Court recommends that Defendants' motions be denied.

### I.  The August 11, 2019 Traffic Stop

Defendant Moore moves the Court for an order suppressing all evidence arising out of the August 11, 2019 traffic stop. Specifically, Defendant Moore argues (1) officers lacked a reasonable articulable suspicion to stop Defendant Moore's vehicle; (2) the stop of Defendant Moore's vehicle was impermissibly extended; and (3) the warrantless search of Defendant Moore's vehicle pursuant to Defendant White's arrest was unconstitutional. (*See* Doc. No. 66, Moore Mem. in Support.) The Government opposes the motion. (Doc. No. 67, Resp.) For the following reasons, this Court recommends that Defendant Moore's Motion to Suppress Evidence Obtained as a Result of Search and Seizure be denied.

### A.    Background

At approximately 4:00 a.m. on August 11, 2019, Officers Zachary Schoen and Michael Capecchi were dispatched to a Holiday gas station on Old Hudson Road in St. Paul, MN.[1] (Doc. No. 61, Tr. 12.) Officer Capecchi was driving. (*Id.*) They were dispatched in response to a 911 call stating that the caller "observed individuals inside a gray sedan passing around bags that [the caller] believed to contain suspected narcotics." (*Id.*) The caller stated that he or she believed the car was a Ford Taurus and provided the license plate number "446XCG." (*Id.* at 13–14.) This information was

---

[1]      Officer Zachary Shoen is a patrol officer with the St. Paul Police Department, where he has worked for approximately three and a half years. Previously, he worked for three years as a police officer for the City of Maplewood. (Tr. 10.) Officer Michael Capecchi has also been a patrol officer with the St. Paul Police Department for the past three years. Previously, he was a police officer with the City of St. Louis Park for over five years. (*Id.* at 25.)

relayed to the officers over the radio and was also provided on a computer screen in the officers' vehicle. (*Id.* at 13.) While on their way to the gas station, Officer Schoen ran the license plate, but it returned to a pickup truck, which did not match the vehicle description provided by the caller. (*Id.* at 14.) Officer Schoen testified that in his experience as a police officer, callers often provide more accurate vehicle descriptions than they do license plate numbers, and thus "in [his] mind, [he] was looking for a gray sedan." (*Id.* at 15.)

Meanwhile, the dispatch center had called the Holiday gas station to attempt to confirm the information the caller had provided. (*Id.*) A gas station employee told the dispatcher that there was a gray Buick four-door sedan parked in front of the store that could be the vehicle the caller was referring to as it was the only gray sedan in the parking lot at the time. (*Id.* at 15–16.) This information was relayed to Officers Schoen and Capecchi via updates on their squad computer. (*Id.* at 13.)

When the officers arrived at the Holiday gas station, they did not pull in immediately; they instead drove by and observed a gray Buick Allure sedan with the license plate "830TGM" parked in front of the gas station. (*Id.* at 16, 22.) There were no other gray sedans in the parking lot. (*Id.*) Officer Schoen testified that this gray Buick attracted his attention because it was similar to the car described by the caller, and an exact match for the car described by the gas-station employee. (*Id.*) The officers then pulled into a parking lot across the street to further observe the Buick. (*Id.* at 17.)

A short time later, the Buick pulled out of the Holiday gas station, and as it did so Officer Schoen observed that the two driver's side windows facing him appeared to be

tinted darker than is allowed by Minnesota law (which requires at least 50% light transmission). (*Id.* at 18.) Because Officer Schoen perceived this as a traffic violation, the officers pulled out behind the vehicle and conducted a traffic stop. (*Id.*) The officers later tested the tint on the windows, and their two readings (14% and 16% transmission) confirmed that the windows' light transmission was well below the legal limit. (*Id*. at 22–23, 41, 42; Gov't Exs. 9–11.)

Once the Buick was stopped, Officer Capecchi approached along the driver side of the Buick, and Officer Schoen along the passenger side. (Tr. 22, 27.) Inside the Buick were three people: the driver was Defendant Moore, the front passenger was an adult female, initials C.D., and Defendant White was seated in the driver-side rear. (*Id.* at 26.) As Officer Capecchi approached, he could not see into the vehicle due to the dark window tint, so he first knocked on the rear window and asked Defendant White to roll the window down and put his hands on his lap. (*Id.* at 39, 46; Gov't Ex. 7, Capecchi Body Camera 1:10.) As Defendant White complied, Officer Capecchi observed that Defendant White was not wearing his seatbelt. (Tr. 26.) At that point, the driver, Defendant Moore, had rolled his window about halfway down. (*Id.* at 39, Capecchi Body Camera 1:24.) Officer Capecchi testified that he found this concerning because usually people roll their windows down completely; he thought Defendant Moore might be trying to hide something from his view. (Tr. 39.) Officer Capecchi was able to see through the window that Defendant Moore had money in his hands. (*Id.* at 40.) Defendant Moore then rolled his window back up, prompting Officer Capecchi to again instruct him to roll it down. (Tr. 40; Capecchi Body Camera 2:39.)

Officer Capecchi retrieved both Defendant Moore's and Defendant White's driver's licenses—the latter because he was not wearing a seatbelt—and returned to his squad car to run them. (Tr. 27.) Officer Capecchi learned that there was a gross misdemeanor warrant for driving after cancellation in Freeborn County for Defendant White's arrest. (*Id.* at 27–28, 51.) At this point, Officer Capecchi radioed for additional officers to come to the scene as he planned on arresting Defendant White pursuant to the warrant, and Officer Schoen and Capecchi were presently outnumbered by the occupants of the Buick. (*Id.* at 28.) Officer Capecchi also learned at this time that the Defendants had previous police contacts involving narcotics and firearms. (*Id.*) A short time later, Officer Matt Jones arrived on the scene, and Officer Capecchi advised him of the warrant for Defendant White. (*Id.* at 29.)

Officers Capecchi and Jones then returned to the Buick and instructed Defendant White to step out of the vehicle. (*Id.* at 29.) Defendant White complied, and Officer Capecchi advised him of the warrant and placed him in handcuffs. (*Id.* at 30.) Defendant White indicated that he was aware of the existence of the warrant. (*Id.*) Officer Capecchi performed a search incident to arrest on Defendant White, which led to the discovery of a plastic bag containing a small amount of what seemed—based on its appearance and smell—to be marijuana in Defendant White's front-right pants pocket. (*Id.* at 30, 57; *see* Gov't Ex. 3., Photograph.) Officer Capecchi testified that the presence of marijuana on Defendant White confirmed his suspicion that the gray Buick was in fact the vehicle the caller had identified as being involved in suspected narcotics trafficking. (Tr. 32.)

Officer Capecchi placed Defendant White in the back of his squad vehicle, advised the other officers on scene of the presence of marijuana, and then instructed Defendant Moore and C.D. to exit the vehicle. (*Id.* at 33.) Defendant Moore appeared "nervous" and asked why he was being made to get out, but he complied. (*Id.*) As he did so, Officer Capecchi removed a large amount of cash from Defendant Moore's pockets, later determined to be three $100 stacks of one-dollar bills. (*Id.* at 33–34; Gov't Ex. 4, Photograph.) Officers Capecchi and Schoen then began searching the Buick for contraband. Officer Capecchi discovered a pistol inside a piece of loose fabric in the driver's seat, and Officer Schoen found another pistol under the front passenger seat. (Tr. 35–36; Gov't Exs. 5, 6.) A digital scale was also found. (Tr. 35.) Officer Capecchi advised the other officers at the scene of the presence of weapons and Defendant Moore and C.D. were detained. (*Id.* at 36.)

### B.    Analysis

#### 1.    The Traffic Stop Was Supported by Probable Cause

Defendant Moore argues that officers lacked a reasonable articulable suspicion to stop Defendant Moore's vehicle, pointing to the inconsistencies between the vehicle description given by the caller (a gray Ford Taurus with license plate 446XCG) and the car Defendant Moore was driving (a gray Buick Allure with license plate 830TGM). (Moore Mem. in Support 5–6.) Defendant Moore asserts that Officer Schoen's testimony that people are better at describing vehicle's physical attributes (e.g., a gray sedan) than they are at remembering license plate numbers is a self-serving rationalization. (*Id.* at 6.) This Court, however, need not determine whether the officers had a reasonable

articulable suspicion pursuant to the 911 call to stop Defendant Moore's vehicle, because the over-dark tint of his windows provided them with independent probable cause to conduct a traffic stop.

It is well settled that "[a]ny traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Adler*, 590 F.3d 581, 583 (8th Cir. 2009) (citation and quotations omitted). Here, Officers Schoen and Capecchi observed that Defendant Moore's windows appeared to be too darkly tinted in violation of Minn. Stat. § 169.71; that fact alone gave them the probable cause they needed to conduct a traffic stop.[2] Defendant Moore contends that the officers had another agenda entirely and that the window-tint issue was "purely pretextual." (Moore Mem. in Support 7.) Even if that were true, however, "it is irrelevant that the officer[s] would have ignored the violation but for [their] ulterior motive." *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011), *cert. denied*, 565 U.S. 893 (2011); *see also United States v. Arciniega*, 569 F.3d 394, 397 (8th Cir. 2009) ("Once an officer has probable cause, the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant."). Accordingly, this Court concludes that the illegal tint on the Buick's windows provided probable cause for Officers Schoen and Capecchi to conduct a traffic stop of Defendant Moore's vehicle.

---

[2]    This Court notes that the officers' observations regarding the window tint were confirmed when they later performed tests on the windows' light transmission and returned readings well below the legal limit in Minnesota. (*See* Tr. 22–23, 41, 42; Gov't Exs. 9–11.)

**2.    Officers Did Not Illegally Extend the Duration of the Traffic Stop**

The driver and passengers of a vehicle may be temporarily detained during a traffic stop while the officer completes routine tasks, such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). Defendant Moore argues that Officers Schoen and Capecchi illegally extended the duration of the traffic stop by improperly targeting Defendant White, performing additional research into the warrant that came back on Defendant White, and looking up Defendants' criminal histories. (Moore Mem. in Support 7–11.) This Court will address each of these allegations in turn.

First, Defendant Moore argues that as the traffic stop got underway, there was no reason for Officer Capecchi to have chosen to interact with Defendant White before Defendant Moore since the latter was the driver of the vehicle. (*Id.* at 8.) This, however, is contradicted by the record. Officer Capecchi approached from the rear of the vehicle, and he testified that he stopped at the rear passenger window first out of a concern for safety because he could not see inside the car due to the extremely dark tint on the windows. (Tr. 39; *see* Capecchi Body Camera 1:10.)

Defendant Moore also objects to Officer Capecchi's determination that Defendant White was breaking the law by not wearing a seatbelt. Defendant Moore argues both that Defendant White should not have been cited because he was not observed without a seatbelt while the vehicle was in motion, and that it would be "irrational" to cite him

since he appeared to have been sleeping in the back seat. (Moore Mem. in Support 8–9.) But back-seat passengers in Minnesota can be cited for failure to wear a seatbelt, even when the violation is not observed while the vehicle is in motion. *See, e.g.*, *State v. Anderson*, No. 27–CR–15–32845, 2017 WL 5661559, *1, *3 (Minn. Ct. App. Nov. 27, 2017) (affirming district court's determination that officer had a basis to identify and cite multiple passengers in a van for seatbelt violations, and observing that "it is unlikely that all passengers would have spontaneously removed their seatbelts"). And Defendant Moore cites to no law supporting his argument that sleeping in the back seat of a vehicle obviates the requirement that one wear a seatbelt while the vehicle is in motion.

Finally, Defendant Moore objects to the fact that Officer Capecchi took additional time to confirm that Defendant White was the subject of an outstanding warrant. (Moore Mem. in Support 10.) Officer Capecchi testified that when he ran Defendant White's information, it came back clear, but also with an alert suggesting that Defendant White might be the subject of a warrant issued for a person with a recorded birth date that was one day off from his. (Tr. 50.) Officer Capecchi testified that he has seen such information entered incorrectly before in his career, so he took the time to confirm the information with dispatch, which resulted in Officer Capecchi learning that the driver's license for both Defendant White, and the White who was the subject of the warrant, were the same. (*Id.*) Based on the circumstances, Officer Capecchi was merely doing his due diligence in determining whether Defendants were subject to outstanding warrants. *See United States v. Olivera–Mendez*, 484 F.3d 505, 510 (8th Cir. 2007) (stating that where an officer encounters a legitimate complication in completing routine tasks, the

officer "may reasonably detain a driver for a longer duration" than when no such complications arise).

Finally, Defendant Moore asserts that it is "important to note that neither officer asked the front passenger, a woman, for her ID or her name." (Moore Mem. in Support 10.) Officer Cappechi, however, testified that he retrieved identification from Defendants because they were the two people in the vehicle who had violated the law (due to the illegal window tint, and Defendant White's failure to wear a seatbelt). In contrast, Officer Cappechi had no such basis to request identifying information from C.D.

In sum, this Court concludes that the officers did not impermissibly extend the duration of the traffic stop.

### 3. The Warrantless Search of Defendant Moore's Vehicle Was Not Unconstitutional

Finally, Defendant Moore argues that the warrantless search of his vehicle was unconstitutional because officers lacked probable cause.[3] "Probable cause to believe that an automobile contains contraband or evidence of criminal activity has long been held to justify a warrantless search of the automobile and seizure of the contraband." *United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016) (citing *Arizona v. Gant*, 556 U.S. 332, 347; *United States v. Ross*, 456 U.S. 798, 806–09 (1982); *United States v. Davis*, 569 F.3d 813, 816 (8th Cir. 2009)). Probable cause for a warrantless search exists where there is a "fair probability that contraband or evidence of a crime will be found in a

---

[3]     Defendant Moore also argues that the search was not a search incident to Defendant White's arrest. The Government, however, does not seek to uphold the search on that basis, and this Court therefore declines to address the merits of that argument.

particular place." *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir.), *cert. denied*, 551 U.S. 1123 (2007) (quotation omitted). To support a finding of probable cause, an officer "must identify specific and articulable facts which, taken together with rational inferences from those facts, amount to reasonable suspicion that further investigation is warranted." *United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017) (quoting *United States v. Woods*, 829 F.3d 675, 679 (8th Cir. 2016)).

Here, the officers relied on the following confluence of factors to support their warrantless search of Defendant Moore's vehicle. First, the initial reason that Officers Schoen and Capecchi encountered Defendants in the early morning hours of August 11, 2019, was due to a 911 call concerning a vehicle engaged in possible narcotics trafficking at a Holiday gas station. When the officers responded, they found Defendant's vehicle, which matched the physical description given by the caller (a gray sedan) but not the make/model or license plate number. It was approximately 4:00 a.m., and there were no other gray sedans in the gas station parking lot. Once the officers stopped Defendants for the window-tint violation, Defendant Moore refused to roll his window—which was heavily tinted—all the way down, and at one point rolled it back up while Officer Capecchi was standing alongside the car. Officer Capecchi testified that in his experience, this was unusual behavior and it led him to suspect Defendant Moore was trying to conceal something from his view. Officer Capecchi also observed through the gap in the window while it was open that Defendant Moore was holding money in his hands. And finally, when Officer Capecchi searched Defendant White incident to his arrest on an unrelated warrant, he found a small bag of what Officer Capecchi believed to

be marijuana on his person. Based on these factors, this Court finds that Officer Capecchi's suspicion that Defendants were engaged in drug trafficking was not unreasonable.

Defendant Moore argues that none of these factors support the probable cause necessary to support a warrantless search. Defendant Moore asserts that the 911 call "was devoid of any information" tying his vehicle "to that which aroused the caller's suspicions." (Moore Mem. in Support 12.) This ignores that the physical description of a gray sedan and the location provided matched Defendant Moore's vehicle. Additionally, as reported by a gas station employee, Defendant Moore's vehicle was the only gray sedan in the parking lot at that time. Defendant Moore also asserts that three one-hundred-dollar stacks of one-dollar bills are not indicative of drug trafficking. (*Id.*) Even if that were true, this argument relies on hindsight because Officer Capecchi did not ascertain the exact amount of cash present until after the search of Defendant Moore's vehicle.

Defendant Moore also draws this Court's attention to statements made by Officer Capecchi during the traffic stop that suggest it was his "subjective desire[]" to search the vehicle. (Moore Mem. in Support 13.) While this is certainly possible, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996). A showing that a police officer wishes to conduct a search is irrelevant as to the search's constitutionality. The remainder of Defendant Moore's arguments seek to isolate individual factors articulated by Officer Capecchi in support of the warrantless search, and then cast them as innocent. (Moore

Mem. in Support 13–15.) For example, Defendant Moore argues the cash was more likely to be used at a strip club than for drug trafficking, and that the marijuana found in Defendant White's possession was a small amount and thus best suited for personal use.[4] But while "each factor giving rise to reasonable suspicion may appear innocent when viewed by itself, 'a combination of factors may warrant further investigation when viewed together.'" *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004) (quoting *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002)).

In sum, this Court concludes that the factors articulated by Officer Capecchi provided the officers with probable cause to search Defendant Moore's vehicle on the morning of August 11, 2019. Therefore, this Court recommends Defendant Moore's Motion to Suppress Evidence be denied.

## II.    Defendant White's November 7, 2019 Statement

Defendant White moves the Court for an order suppressing statements, admissions, and answers obtained in violation of his Fifth and Sixth Amendment rights. (*See* White Mem. to Supp.) The Government opposes Defendant White's motion. (Resp. 13–17.)

---

[4]    Defendant Moore also argues that Officer Capecchi's evident confusion as to whether the amount of marijuana found on Defendant White constituted a crime is a "mistake of law" fatal to the warrantless search. (Moore Mem. in Support 14.) But Officer Capecchi testified that he decided to search the vehicle because the presence of drugs confirmed his suspicion that the occupants of the vehicle were engaged in criminal activity; he did not testify that the warrantless search was incident to Defendant White's arrest. (Tr. 32–33.) Thus, whether he incorrectly thought the marijuana seized could be charged as a separate crime is irrelevant to this analysis.

### A. Background

On November 6, 2019, Defendant White was arrested pursuant to a warrant for allegedly violating 18 U.S.C. §§ 922(g)(1), 924(a)(2). (Tr. 70; *see* Doc. No. 1, Compl.) Defendant White was given a *Miranda* warning, waived his rights, and spoke with St. Paul Police Sergeant Schwab twice on November 6th.[5] (Tr. 63, 70, 72; Doc. No. 65, White Mem. in Support 3.) Defendant White remained in custody overnight and was questioned once again by Sergeant Schwab on November 7th. (*See* Def. Ex. 1, Schwab Interrogation.)

Sergeant Schwab began the interview by acknowledging Defendant White's prior Mirandization. (*Id.* at 00:59.) Sergeant Schwab next asked Defendant White about the shoes Defendant Moore was wearing when the two of them were arrested, and then inquired about Defendant Moore's connection to a murder that occurred at the Saint Paul Saloon. (*Id.* at 1:30.) Sergeant Schwab reminded Defendant White that they had previously discussed the implications of a federal, versus state, criminal indictment. (*Id.* at 3:18.) Defendant White appeared surprised that the federal authorities would take up his first-time firearm offense merely on account of his connection to Defendant Moore.

---

[5]    At the motion hearing, the Government represented that it does not intend to offer Defendant White's statements from November 6th, and Defendant White has therefore agreed not to challenge them. (Tr. 77–78; White Mem. in Support 3.) The Court notes that Defendant Moore also filed a Motion to Suppress Statements, Admissions, and Answers (Doc. No. 44). That motion, however, fails to specify what statements Defendant Moore wished to suppress, and neither his post-hearing briefing nor the Government's Response address the issue at all. Accordingly, this Court recommends that motion be denied.

(*Id.* at 3:43.) Sergeant Schwab then stated, "I think you know more about this [the Saint

Paul Saloon] murder." (*Id.* at 4:43.) This then led to the following exchange:

> WHITE: I don't know sh*t about that murder. I don't even want to talk to
> you about that murder. Now you're pissing me off. I told you every f*cking
> thing that I knew. Now you going tell me that I know something about
> some sh*t that I don't know. I was in the f*cking bar [indistinct] when this
> sh*t happened. So how would I know anything more unless somebody told
> me, ain't nobody told sh*t. So leave me the f*ck alone, I don't want to talk
> about that sh*t no more. F*ck that murder, for real. Now you're pissing me
> off, man. I'm already here fighting this sh*t. Now you're steady telling me
> I'm lying when I'm being honest with you. And I've told you when I don't
> even have to talk to you. And I told you . . . I don't even have to talk to you
> about sh*t . . . . Now you're telling me that I'm lying.
>
> SCHWAB: I never said you were lying . . . I'm saying I think you might
> know more about this.
>
> WHITE: I told you everything that I knew.
>
> SCHWAB: All right, well, just keep that in mind when you're over talking
> with the feds, all right. Just keep that in mind. All right.

(*Id.* at 4:47–5:37.) There is then a pause of about twenty seconds where neither man

speaks before the final exchange:

> SCHWAB: Kevin, I never said you were lying about nothing.
>
> WHITE: Basically, you are, man. You said that I'm . . . holding something back,
> that's what you think [unintelligible] when I told you every f*cking thing, man.
>
> SCHWAB: We're done here.

(*Id.* at 5:56–6:11.)

Shortly thereafter, at about 9:00 a.m., Sergeant Timothy Moore[6] picked up

Defendant White for transfer into federal custody. (Tr. 62.) Sergeant Moore entered the

---

[6]    Sergeant Timothy Moore works in the City of St. Paul Police Department's gang

Ramsey County Jail while his partner, ATF Agent Micah Vanotterloo remained in their vehicle in the sally port. (*Id.*) Sergeant Moore was aware that Defendant White had been Mirandized and spoken to by Sergeant Schwab twice the day prior but was unaware of the November 7th interrogation. (*Id.* at 63, 72.) Sergeant Schwab retrieved Defendant White from deputies just outside the jail, handcuffed Defendant White, and proceeded to walk him out toward the sally port. (*Id.* at 63.) While in the jail, Sergeant Moore turned off his body camera per department policy, but he activated it again upon picking up Defendant White and leaving. (*Id.* at 65; *See* Gov't Ex. 12, Moore Body Camera.)

As Sergeant Moore opened an exit door, Defendant White began to speak, unprompted:

> Man, I don't understand this, how is I'm going to the feds for my first gun case. . . . It don't even make sense bro. And the gun ain't even mine, I wasn't . . . I was in the back seat of the car when they found these guns. I wasn't . . . this sh*t wasn't nowhere around me. My DNA on there, okay, I probably touched that b*tch before but I ain't have that sh*t in that car. This sh*t for real, man. I thought it took six months to a year for DNA to come back off a gun anyway.

(Moore Body Camera at 00:30.) Sergeant Moore replied, "It all depends, man. It all— each case is different, you know what I mean?" (*Id.* at 1:13.) Defendant White responded, "That's what the investigator told me when, when he locked me up on the case. He said six months to a year before he get back the DNA on there." (*Id.* at 1:22.) Sergeant Moore testified that while Defendant White seemed "confused or perplexed," he was "calm."

---

and gun unit. He also works for the Bureau of Alcohol, Tobacco, Firearms and Explosives presenting state cases for federal charges. Sergeant Moore has been a police officer for almost twenty years, all of them spent with the City of St. Paul. (Tr. 60.)

(Tr. 66–67.) At no point did Defendant White voice any complaints, appear upset, or raise his voice at Sergeant Moore. (*Id.* at 67.)

## B. Analysis

The Government does not intend to offer Defendant White's statements to Sergeant Schwab; however, the Government seeks to introduce Defendant White's subsequent interaction with Sergeant Moore, "captured in Government Exhibit 12." (Tr. 77.) Defendant White seeks to suppress that statement, arguing that Sergeant Schwab manipulated him into making the later statement to Sergeant Moore by failing to scrupulously honor Defendant White's alleged invocation of his right to remain silent. (White Mem. in Support 9–13.) Specifically, Defendant White alleges that Sergeant Schwab "play[ed] on Mr. White's naïveté concerning the federal criminal justice system" when he told him, "just keep that in mind when you're over talking with the feds, all right. Just keep that in mind." (White. Mem. in Support 10.) This Court disagrees that Defendant White's statements to Sergeant Moore should be suppressed on those grounds.

## 1. Defendant White Did Not Invoke His Right to Remain Silent During His Interview with Sergeant Schwab

First, this Court does not find that Sergeant Schwab disregarded Defendant's right to remain silent. The Fifth Amendment privilege against self-incrimination is safeguarded after arrest by the mandatory warning procedures outlined in *Miranda v. Arizona*, 384 U.S. 436, 467–79 (1966). After giving *Miranda* warnings to a suspect in custody, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74. "[A] person's 'right

to cut off questioning'" is central to the Fifth Amendment, and this right must be

"'scrupulously honored.'" *Michigan v. Mosley*, 423 U.S. 96, 103 (1975) (quoting

*Miranda*, 384 U.S. at 474). "To invoke this right and effectively cut off questioning, a

suspect must make 'a clear, consistent expression of a desire to remain silent.'" *United*

*States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995) (quoting *United States v. Thompson*,

866 F.2d 268, 272 (8th Cir. 1989)). Courts consider a defendant's "statements as a whole

to determine whether they indicate an unequivocal decision to invoke the right to remain

silent." *Id.* Ambiguous, equivocal, or dubious assertions of a desire to remain silent are

insufficient to invoke one's right to remain silent. *Thompson*, 866 F.3d at 272.

Here, Defendant White concedes that he was validly Mirandized on November 6,

2019, waived his *Miranda* rights, and was reminded of those rights by Sergeant Schwab

at the beginning of the November 7 interview. (White Mem. in Support 3–4.) As

Defendant White describes, Sergeant Schwab began the interview by questioning him

"about the shoes that co-Defendant Moore was wearing at the time of his arrest and

Mr. Moore's relationship to a murder at the St. Paul Saloon." (*Id.* at 4.) Later, Sergeant

Schwab told Defendant White that he thought Defendant White knew "more about this

murder." In response, Defendant White stated:

> I don't know sh*t about that murder. I don't even want to talk to you about
> that murder. Now you're pissing me off. I told you every f*cking thing that
> I knew. Now you going tell me that I know something about some sh*t that
> I don't know. I was in the f*cking bar [indistinct] when this sh*t happened.
> So how would I know anything more unless somebody told me, ain't
> nobody told sh*t. So leave me the f*ck alone, I don't want to talk about that
> sh*t no more. F*ck that murder, for real. Now you're pissing me off, man.
> I'm already here fighting this sh*t. Now you're steady telling me I'm lying
> when I'm being honest with you. And I've told you when I don't even have

to talk to you. And I told you . . . I don't even have to talk to you about sh*t
. . . . Now you're telling me that I'm lying.

(Schwab Interrogation 4:47.)

Defendant White claims this response expressed his clear desire to revoke his prior waiver and unequivocally invoke his right to remain silent. (White Mem. in Support 8–9.). But Defendant White "did not clearly and unambiguously invoke his Fifth Amendment right to remain silent because he continued to talk." *United States v. Lewis*, No. CR 18-194 (ADM/DTS), 2018 WL 6991111, at *3 (D. Minn. Dec. 7, 2018), *report and recommendation adopted*, No. CR 18-194 ADM/DTS, 2019 WL 163119 (D. Minn. Jan. 10, 2019) ("Even if the Court deems 'I'm done talking' to be an invocation of Lewis's right to remain silent, the record here establishes that he immediately waived that right when he spontaneously continued talking to the detectives.") (citing *United States v. Smith*, Criminal No. 13-20263, 2013 WL 5745133, at * 5 (E.D. Mich. Oct. 23, 2013)); *see also United States v. Adams*, 820 F.3d 317, 323 (8th Cir. 2016) (concluding that a defendant failed to effectively invoke his right to remain silent by stating "[n]ah, I don't want to talk, man," when he then immediately continued speaking with the investigator"). This Court concludes that Defendant White's course of conduct was inconsistent with a desire to exercise his right to remain silent, and thereby waived that right.[7]

---

[7]     *See Lewis*, 2018 WL 6991111, at *4 ("*Miranda* 'does not impose a formalistic waiver procedure,' and a suspect's course of conduct after receiving and understanding his *Miranda* rights can indicate a waiver of those rights. . . . Lewis engaged in a course of conduct inconsistent with a desire to exercise his right to remain silent and thereby waived that right.") (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 385–86 (2010)).

### 2.    Defendant White's Statements to Sergeant Moore Were Spontaneous and Voluntary

Even if Defendant White could establish that his right to remain silent was not honored by Sergeant Schwab, Defendant White's subsequent statements to Sergeant Moore during his transport from Ramsey County to the federal courthouse in St. Paul were not improperly induced by Sergeant Schwab's earlier interactions. It is well settled in the Eighth Circuit that "[a] voluntary statement made by a suspect, not in response to interrogation, is not barred [by the Fifth Amendment] and is admissible with or without the giving of *Miranda* warnings." *United States v. Turner*, 157 F.3d 552, 556 (8th Cir. 1998) (quoting *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995), *cert. denied*, 516 U.S. 1150 (1996)); *United States v. Cunningham*, 133 F.3d 1070, 1074 (8th Cir. 1998), *cert. denied*, 523 U.S. 1131 (1998) (holding where officers merely listen to suspect, suspect's statements may be used against him). "*Miranda* does not protect an accused from a spontaneous admission made . . . during a conversation not initiated by the officers." *United States v. Hayes*, 120 F.3d 739, 744 (8th Cir. 1997) (quoting *United States v. Hawkins*, 102 F.3d 973, 975 (8th Cir. 1996), *cert. denied*, 520 U.S. 1179 (1997)). Here, the record demonstrates that Defendant White's statements to Sergeant Moore were both spontaneous and voluntary, and "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Miranda*, 384 U.S. at 478.

Defendant White argues that his statements to Sergeant Moore were "not spontaneous as imagined by the *Butzin* court." (White Mem. in Support 11 (citing *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989).) This Court disagrees. In *Butzin*, the

defendant challenged custodial statements on the grounds that they were tainted by officers' failure to expressly advise him of his right to have counsel present during an interrogation the day prior. *Butzin*, 886 F.2d at 1018. The Eighth Circuit rejected that argument because the defendant "initiated the conversation" at issue and "custodial statements made on the suspect's own initiative are not subject to the safeguards of *Miranda*." *Butzin*, 886 F.2d at 1018 (citing *Stumes v. Solem*, 752 F.2d 317, 322–23 (8th Cir. 1985)). The *Butzin* court observed that the challenged statements were "not in response to the interrogation of the day before" because it was the defendant "who asked to renew his contact with [the officer]" the following day and because the defendant "was at that point not under great pressure from the authorities to say any more." *Id.*

As was the case in *Butzin*, Defendant White's statements were not made in response to his earlier interrogation. When Sergeant Moore took custody of Defendant White, the November 7th interview with Sergeant Schwab had already ended, Defendant White had been moved to a holding cell, and Sergeant Schwab was no longer present. (Tr. 73–74.) Defendant White then spontaneously initiated a discussion with Sergeant Moore – unprovoked in any way by Sergeant Moore. The record demonstrates that Sergeant Moore did not ask Defendant White any questions, nor is there any indication that Sergeant Moore said or did anything designed to elicit a statement from Defendant White. Defendant White had already spoken to investigators three times, and there is no indication he was "under great pressure from the authorities" to say more. *Butzin*, 886 F.2d at 1018.

In sum, this Court concludes that Defendant White never effectively invoked his

right to remain silent during his conversation with Sergeant Schwab and, even if he had, Defendant White's subsequent statement to Sergeant Moore was a spontaneous, voluntary statement. Therefore, this Court recommends that Defendant White's Motion to Suppress Statements, Admissions, and Answers be denied.

### III.    Conclusion

For the foregoing reasons, this Court recommends that Defendant White's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 35), Defendant Moore's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 44), and Defendant Moore's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 45) be denied.

**RECOMMENDATION**

Based on the foregoing, and on all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.    Defendant White's Motion to Suppress Statements, Admissions, and Answers **(Doc. No. 35)** be **DENIED**;

2.    Defendant Moore's Motion to Suppress Statements, Admissions, and Answers **(Doc. No. 44)** be **DENIED**; and

3.    Defendant Moore's Motion to Suppress Evidence Obtained as a Result of Search and Seizure **(Doc. No. 45)** be **DENIED**.

Dated: April 29, 2020.                          *s/ Becky R. Thorson*
                                                BECKY R. THORSON
                                                United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report within **fourteen days**. A party may respond to those objections within **fourteen days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).